**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

WILLIAM DAVIS,                     )
                                   )
                Plaintiff,         )
                                   )
    v.                             )          1:20CV640
                                   )
KILOLO KIJAKAZI,                   )
Acting Commissioner of Social      )
Security,[1]                       )
                                   )
                Defendant.         )

**MEMORANDUM OPINION AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

Plaintiff, William Davis, brought this action pursuant to the Social Security Act (the "Act") to obtain judicial review of a final decision of Defendant, the Acting Commissioner of Social Security, denying Plaintiff's claim for Disability Insurance Benefits ("DIB"). (Docket Entry 1.) Defendant has filed the certified administrative record (Docket Entry 10 (cited herein as "Tr. __")), and both parties have moved for judgment (Docket Entries 14, 19; see also Docket Entry 15 (Plaintiff's Memorandum); Docket Entry 20 (Defendant's Memorandum). For the reasons that follow, the Court should remand this matter for further administrative proceedings.

---

[1] President Joseph R. Biden, Jr., appointed Kilolo Kijakazi as the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi should be substituted for Andrew M. Saul as the Defendant in this suit. Neither the Court nor the parties need take any action to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

# I. PROCEDURAL HISTORY

Plaintiff applied for DIB (Tr. 174-77), alleging a disability onset date of December 23, 2015 (see Tr. 174). Upon denial of that application initially (Tr. 70-84, 102-05) and on reconsideration (Tr. 85-101, 108-11), Plaintiff requested a hearing de novo before an Administrative Law Judge ("ALJ") (Tr. 112). Plaintiff, his non-attorney representative, and a vocational expert ("VE") attended the hearing. (Tr. 37-69.) The ALJ subsequently ruled that Plaintiff did not qualify as disabled under the Act. (Tr. 12-28.) The Appeals Council thereafter denied Plaintiff's request for review (Tr. 1-6, 172), thereby making the ALJ's ruling the Commissioner's final decision for purposes of judicial review.

In rendering that decision, the ALJ made the following findings later adopted by the Commissioner:

> 1. [Plaintiff] last met the insured status requirements of the . . . Act on June 30, 2019.
>
> 2. [Plaintiff] did not engage in substantial gainful activity during the period from his alleged onset date of December 23, 2015 through his date last insured of June 3, 2019.
>
> 3. Through the date last insured, [Plaintiff] had the following severe impairments: complex regional pain syndrome and fibromyalgia.
>
> . . .
>
> 4. Through the date last insured, [Plaintiff] did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

2

.  .  .

5.  .  .  .  [T]hrough the date last insured, [Plaintiff]
had the residual functional capacity to perform less than
the full range of light work . . . .  He could lift,
carry, push, and pull 20 pounds occasionally and 10
pounds frequently; stand and walk in combination six
hours in an eight-hour workday; sit six hours in an
eight-hour workday; and occasionally climb, balance,
stoop, kneel, crouch, and crawl.

.  .  .

6.  Through the date last insured, [Plaintiff] was
unable to perform any past relevant work.

.  .  .

10.  Through the date last insured, considering
[Plaintiff]'s age, education, work experience, and
residual functional capacity, there were jobs that
existed in significant numbers in the national economy
that [he] could have performed.

.  .  .

11.  [Plaintiff] was not under a disability, as defined
in the . . . Act, at any time from December 23, 2015, the
alleged onset date, through June 30, 2019, the date last
insured.

(Tr. 17-27 (bold font and internal parenthetical citations

omitted).)

## II.  DISCUSSION

Federal law "authorizes judicial review of the Social Security

Commissioner's denial of social security benefits."  Hines v.

Barnhart, 453 F.3d 559, 561 (4th Cir. 2006).  However, "the scope

of . . . review of [such a] decision . . . is extremely limited."

Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981).  Even given

3

those limitations, the Court should remand this case for further administrative proceedings.

## A.  Standard of Review

"[C]ourts are not to try [a Social Security] case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, "a reviewing court must uphold the factual findings of the ALJ [underlying the denial of benefits] if they are supported by substantial evidence and were reached through application of the correct legal standard." Hines, 453 F.3d at 561 (internal brackets and quotation marks omitted).

"Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992) (quoting Richardson v. Perales, 402 U.S. 389, 390 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (internal brackets and quotation marks omitted). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the [C]ourt should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ, as adopted by the Social Security Commissioner]." Mastro, 270 F.3d at

4

176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Social Security Commissioner] (or the ALJ)." Id. at 179 (internal quotation marks omitted). "The issue before [the Court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

When confronting that issue, the Court must take note that "[a] claimant for disability benefits bears the burden of proving a disability," Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981), and that, in this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months,'" id. (quoting 42 U.S.C. § 423(d)(1)(A)).[2] "To regularize the adjudicative process, the Social Security Administration [('SSA')]

---

[2] The Act "comprises two disability benefits programs. [DIB] . . . provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income Program . . . provides benefits to indigent disabled persons. The statutory definitions and the regulations . . . for determining disability governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1 (internal citations omitted).

has . . . promulgated . . . detailed regulations incorporating longstanding medical-vocational evaluation policies that take into account a claimant's age, education, and work experience in addition to [the claimant's] medical condition." Id. "These regulations establish a 'sequential evaluation process' to determine whether a claimant is disabled." Id. (internal citations omitted).

This sequential evaluation process ("SEP") has up to five steps: "The claimant (1) must not be engaged in 'substantial gainful activity,' i.e., currently working; and (2) must have a 'severe' impairment that (3) meets or exceeds the 'listings' of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity to (4) perform [the claimant's] past work or (5) any other work." Albright v. Commissioner of Soc. Sec. Admin., 174 F.3d 473, 475 n.2 (4th Cir. 1999).[3] A finding adverse to the claimant at any of several points in the SEP forecloses an award and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

---

[3] "Through the fourth step, the burden of production and proof is on the claimant. If the claimant reaches step five, the burden shifts to the [government] . . . ." Hunter, 993 F.2d at 35 (internal citations omitted).

6

On the other hand, if a claimant carries his or her burden at each of the first three steps, "the claimant is disabled." Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment, the ALJ must assess the claimant's residual functional capacity ('RFC')." Id. at 179.[4] Step four then requires the ALJ to assess whether, based on that RFC, the claimant can "perform past relevant work"; if so, the claimant does not qualify as disabled. Id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, whereupon the ALJ must decide "whether the claimant is able to perform other work considering both [the RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the government cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs

---

[4] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain)." Hines, 453 F.3d at 562-63.

7

available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.[5]

## B. Assignments of Error

Plaintiff asserts that the Court should overturn the ALJ's finding of no disability on these grounds:

1) "[t]he ALJ erred by failing to perform a necessity analysis of [] Plaintiff's need for a hand-held assistive device" (Docket Entry 15 at 4 (bold font and single-spacing omitted));

2) "[t]he ALJ misevaluated the medical opinion of Dr. [Edward] Forero, the [consultative medical examiner]" (id. at 7 (bold font omitted)); and

3) "[t]he ALJ failed to account for Plaintiff's need to elevate his left lower extremity in the RFC" (id. at 11 (bold font and single-spacing omitted).

Defendant contends otherwise and seeks affirmance of the ALJ's decision. (See Docket Entry 20 at 5-19.)

### 1. Need for a Hand-Held Assistive Device

In Plaintiff's first assignment of error, he asserts that "[t]he ALJ erred by failing to perform a necessity analysis of []

_____

[5] A claimant thus can qualify as disabled via two paths through the SEP. The first path requires resolution of the questions at steps one, two, and three in the claimant's favor, whereas, on the second path, the claimant must prevail at steps one, two, four, and five. Some short-hand judicial characterizations of the SEP appear to gloss over the fact that an adverse finding against a claimant on step three does not terminate the analysis. See, e.g., Hunter, 993 F.2d at 35 ("If the ALJ finds that a claimant has not satisfied any step of the process, review does not proceed to the next step.").

Case 1:20-cv-00640-LCB-LPA   Document 21   Filed 01/19/22   Page 8 of 31

Plaintiff's need for a hand-held assistive device."  (Docket Entry 15 at 4 (bold font and single-spacing omitted).)  In that regard, Plaintiff points to his testimony "that he use[d] his can [sic] to walk for both balance and stability" (id. (citing Tr. 60)), as well as to "medical evidence supporting [his] assertion that he ha[d] consistently used a cane and need[ed] a cane" (id.; see also id. at 4-5 (detailing evidence Plaintiff believes supports his need for a cane (citing Tr. 264, 293-94, 356-57, 361, 363, 376, 386, 400, 407, 424, 482, 537, 571, 592, 609, 632, 641, 645, 653))).  Plaintiff notes that, "despite th[at] testimony and medical evidence, the ALJ did not perform an analysis of [Plaintiff's] need for an assistive device and did not articulate a rationale for excluding such a limitation from the RFC."  (Id. at 5 (citing Tr. 19-25); see also id. (highlighting VE's "testi[mony] that a cane alone would preclude 'most' jobs at the light level of exertion" (quoting Tr. 66)).)

According to Plaintiff, Social Security Ruling 96-9p, Titles II and XVI: Determining Capability to Do Other Work - Implications of a Residual Functional Capacity for Less Than a Full Range of Sedentary Work, 1996 WL 374185, at *7 (July 2, 1996) ("SSR 96-9p"), "requires ALJ's [sic] to determine whether or not a hand-held assistive device is medically necessary" (Docket Entry 15 at 5), and to "review the medical evidence . . . [to] determine whether the device is needed all the time, periodically or only in certain

9

situations such as long distances or uneven terrain" (id. at 6).
Plaintiff further argues that "'a prescription or the lack of a
prescription for an assistive device is not necessarily dispositive
of medical necessity'" (id. (quoting Fletcher v. Colvin, No.
1:14CV380, 2015 WL 4506699, at *8 (M.D.N.C. July 23, 2015)
(unpublished) (Webster, M.J.), recommendation adopted, slip op.
(M.D.N.C. Aug. 14, 2015) (Biggs, J.))), as well as that "remand
[i]s warranted where the ALJ 'fail[s] to *explicitly* address whether
Plaintiff's need for a [hand-held assistive device] was medically
necessary and, at most, seems to tacitly reject the notion that it
could be'" (id. (quoting Fletcher, 2015 WL 4506699, at *9 (emphasis
added by Plaintiff); see also id. at 6-7 (citing Smith v. Saul, No.
5:18CV282, 2019 WL 5800086, at *9-10 (E.D.N.C. July 16, 2019)
(unpublished), recommendation adopted, 2019 WL 3820094 (E.D.N.C.
Aug. 14, 2019) (unpublished), McLaughlin v. Colvin, No. 1:12CV621,
2014 WL 12573323, at *2 (M.D.N.C. July 25, 2014) (Dever, C.J.,
E.D.N.C. by designation), and Steigerwald v. Commissioner of Soc.
Sec., No. 1:12CV2739, 2013 WL 5330837, at *5 (N.D. Ohio Sept. 23,
2013) (unpublished))). Plaintiff's contentions ultimately fail to
establish a basis for remand.

As Plaintiff has argued, "the legal issue does not turn on
whether a cane was 'prescribed' . . . but whether a cane was
'medically required.'" Spaulding v. Astrue, 379 F. App'x 776, 780
(10th Cir. 2010). However, "[t]o find that a hand-held assistive

device is medically required, there must be <u>medical documentation</u> <u>establishing the need for a hand-held assistive device</u> to aid in walking or standing, and <u>describing the circumstances for which it</u> <u>is needed</u> (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information)." SSR 96-9p, 1996 WL 374185, at *7 (emphasis added).

To begin, Plaintiff's assertion that the ALJ failed to "perform an analysis of [Plaintiff]'s need for an assistive device" (Docket Entry 15 at 6) glosses over the following analysis by the ALJ:

> On August 14, 2018, <u>Dr. Forero stated [Plaintiff] used a</u> <u>simple cane for walking, standing, balance, and pain.</u> <u>The cane was needed all the time</u> and was prescribed by a doctor, and [Plaintiff] was instructed to carry it in his right hand. . . . <u>The [ALJ] finds Dr. Forero's opinion</u> <u>is not persuasive. . . . His opinion is not consistent</u> <u>with the other medical evidence of record, which shows</u> <u>[Plaintiff] had improved strength in the left lower</u> <u>extremity to 4/5 and otherwise generally normal exams</u>.

(Tr. 25 (emphasis added) (internal parenthetical citations omitted); <u>see also</u> Tr. 24 (observing that "the evidence does not support the alleged loss of functioning" and summarizing evidence supporting that statement).) Thus, Plaintiff's argument that "remand [i]s warranted [because] the ALJ 'failed to *explicitly* address whether Plaintiff's need for a [hand-held assistive device] was medically necessary and, at most, seem[ed] to tacitly reject the notion that it could be'" (Docket Entry 15 at 6 (quoting <u>Fletcher</u>, 2015 WL 4506699, at *9 (emphasis added by Plaintiff)))

11

falls short. Moreover, for the reasons discussed in more detail below, even if the ALJ had failed to analyze the necessity of Plaintiff's cane (and even if the record compelled the ALJ to include the need for a cane in the RFC), any error by the ALJ in that regard would qualify as harmless under the circumstances presented here. See generally Fisher v. Bowen, 869 F.2d 1055, 1057 (7th Cir. 1989) (observing that "[n]o principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result"); see also Shinseki v. Sanders, 556 U.S. 396, 409 (2009) ("[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination.").

During the hearing, the ALJ asked the VE whether a hypothetical individual limited to light work with occasional postural movements could perform any work existing in significant numbers in the national economy (see Tr. 64), and the VE testified that such an individual would remain capable of performing the jobs of mail clerk, cashier, and x-ray inspector (see Tr. 64-65). Subsequently, the ALJ inquired as to whether jobs would exist for an individual limited to sedentary work with no climbing of ladders, ropes, or scaffolds, no crawling, and other postural movements occurring only occasionally (see Tr. 65), and the VE provided three responsive jobs, processor, nut sorter, and dowel

12

inspector (see Tr. 65-66). The ALJ thereafter asked whether a requirement for a cane "for both balance and ambulation" would impact the cited jobs, and the VE responded that such a requirement "would hamper the performance of most light jobs because . . . [t]he essential functions of th[o]se jobs are essentially bimanual in nature," but that the sedentary jobs "would not be hampered . . . because the essential functions are performed in a seated position." (Tr. 66.)

Although the ALJ ultimately adopted a light-exertion RFC (see Tr. 19) and relied on light-exertion jobs at step five of the SEP (see Tr. 27), the regulations make clear that, "[i]f someone can do light work, . . . he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time," 20 C.F.R. § 404.1567(b) (emphasis added); see also 20 C.F.R. Pt. 404, Subpt. P, App'x 2, § 202.00(a) (providing that the full range of light work "includes the functional capacity to perform sedentary as well as light work"). Here, the ALJ specifically found that Plaintiff retained the ability to "sit six hours in an eight-hour workday" and did not include any manipulative limitations in the RFC. (Tr. 19.) Thus, because the ALJ's decision establishes that Plaintiff remained capable of the sitting and manipulative requirements of the sedentary jobs cited by the VE, Plaintiff has not shown that remanding his case for the ALJ to include the need for a cane in

13

the RFC would result in a more favorable outcome in his claim.  See Austin v. Commissioner of Soc. Sec., No. 1:19CV2380, 2020 WL 9460505, at *14 (N.D. Ohio July 7, 2020) (unpublished) ("[A]n ALJ's error in [] failing to include a use-of-a-cane limitation in the RFC . . . is harmless when the claimant cannot show that the ultimate determination – that there were a significant number of available jobs – would have been different had such a limitation been included."), recommendation adopted, 2021 WL 1540389 (N.D. Ohio Apr. 19, 2021) (unpublished); Plezia v. Commissioner of Soc. Sec., No. 1:17CV1765, 2018 WL 3216055, at *5 (N.D. Ohio June 14, 2018) (unpublished) ("The ALJ posed a hypothetical to the VE incorporating sedentary work with the use of a cane for ambulation. In response, the VE identified a significant number of jobs in the regional and national economies.  Therefore, any error with the light work RFC would be harmless." (footnotes omitted)), recommendation adopted, 2018 WL 3208164 (N.D. Ohio June 29, 2018) (unpublished); Jozlin v. Commissioner of Soc. Sec., No. 12CV10999, 2013 WL 951034, at *9 (E.D. Mich. Mar. 12, 2013) (unpublished) (finding harmless error arising from ALJ's failure to include need for cane in light-exertion RFC where, "even if the ALJ had included [the p]laintiff's alleged need to ambulate with a cane in her RFC, . . . the RFC would have limited her to sedentary work, and the VE testified that jobs existed in the economy for an individual with such limitations" (certain internal quotation marks, brackets,

ellipses, and parenthetical citations and notations omitted));
compare Stepp v. Colvin, No. 8:15CV1183, 2016 WL 4150479, at *8
n.16 (M.D. Fla. July 11, 2016) (unpublished) ("The [c]ourt has
considered that even an individual using a medically required
hand-held assistive device can perform sedentary work, depending on
the facts and circumstances of the case. Thus, the VE at the
hearing testified that a person with the same limitations as [the
p]laintiff could, at the sedentary exertion level, perform the jobs
of mail sorter or document preparer. H[owever], the ALJ did not
determine whether [the p]laintiff is capable of performing
sedentary work, including that [the p]laintiff could sit for six to
eight hours in light of his back impairments. . . . Thus, it is
not clear to th[e c]ourt that the ALJ would have reached the same
decision denying benefits based on the VE's testimony regarding
sedentary work." (emphasis added) (internal citations omitted)),
recommendation adopted, 2016 WL 4157334 (M.D. Fla. Aug. 2, 2016)
(unpublished).

In short, Plaintiff's first assignment of error fails as a
matter of law.

### 2. Opinions of Dr. Forero

Next, Plaintiff contends that "[t]he ALJ misevaluated the
medical opinion of Dr. Forero, the [consultative medical
examiner]." (Docket Entry 15 at 7 (bold font omitted).) More
specifically, Plaintiff maintains that the ALJ's finding that Dr.

15

Forero's opinion "was inconsistent with . . . examinations that were mostly normal save for reduced strength . . . misses the point" (id. at 8 (citing Tr. 25)), because Plaintiff's "primary impairment was [chronic regional pain syndrome ('CRPS')] and his primary limiting factor and the cause of his loss of function was pain" and thus "[i]ntermittent normal findings do not negate [his] pain" (id. (citing Arakas v. Commissioner of Soc. Sec. Admin., 983 F.3d 83, 97-98 (4th Cir. 2020), for proposition that "ALJs may not rely on objective findings to discount subjective complaints of pain regarding the symptoms of diseases that do not produce such evidence")). Plaintiff additionally challenges the ALJ's observation that Dr. Forero failed to "explain and define what he mean[t] by 'moderately impaired'" (id. (quoting Tr. 25)), because Dr. Forero also "unambiguously state[d] that [Plaintiff] need[ed] a cane in all situations and . . . [wa]s unable to walk a block at a reasonable pace on rough/uneven surfaces [or] . . . climb a few steps at a reasonable pace with the use of single handrail" (id. at 8-9 (citing Tr. 294)). Plaintiff's contentions warrant remand for re-evaluation of Dr. Forero's opinions.

For benefits applications filed on or after March 27, 2017 (such as Plaintiff's (see Tr. 174-77)), the SSA has enacted substantial revisions to the regulations governing the evaluation of opinion evidence. See Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01, 2017 WL

16

168819 (Jan. 18, 2017).  Under the new regulations, ALJs are no longer required to assign an evidentiary weight to medical opinions or to accord special deference to treating source opinions.  See 20 C.F.R. § 404.1520c(a) (providing that ALJs "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources").  Instead, an ALJ must determine and "articulate in [the] . . . decision how persuasive [he or she] find[s] all of the medical opinions and all of the prior administrative medical findings in [a claimant's] case record." 20 C.F.R. § 404.1520c(b) (emphasis added).  In evaluating the persuasiveness of an opinion or finding, the SSA deems supportability and consistency "the most important factors" and thus the ALJ must address those two factors in evaluating the persuasiveness of an opinion or a finding. 20 C.F.R. § 404.1520c(b)(2).  The ALJ must address the three other persuasiveness factors — the nature and extent of the medical source's relationship with the claimant and area of specialization, as well as the catch-all "other factors that tend to support or contradict" the opinion/finding, 20 C.F.R. § 404.1520c(c)(3)-(5) — only when the ALJ finds two or more opinions or findings about the

17

same issue "[e]qually persuasive" in terms of supportability and consistency, 20 C.F.R. § 404.1520c(b)(3).[6]

On August 14, 2018, Dr. Forero conducted a consultative medical examination of Plaintiff (see Tr. 291-94), at which he documented that Plaintiff appeared "in distress" and exhibited "[m]oderate difficulty getting up from a chair, on and off [the] exam table[, and] . . . lying in [a] supine position and rising" (Tr. 293). Dr. Forero further noted that Plaintiff remained "[u]nable to heel[,] toe[, and] tandem walk without difficulty" and maintained an "antalgic" posture. (Id.) From a neurological standpoint, Dr. Forero recorded that Plaintiff's "[s]ensation to pain, touch, and proprioception" seemed "exaggerated" and that Plaintiff described "[s]oft touch with the finger in [his] lower extremities" as "like needles sticking with pain" and "prefer[red his] legs not to be touched because of discomfort," which Dr. Forero deemed "sort of unusual" (Tr. 294.) Regarding musculoskeletal findings, Dr. Forero observed an "[u]nsteady gait, abnormal station, [and] muscle strength [of] 3/5 in [the] lower extremities," as well as that Plaintiff "[c]ould sit, stand with complaints of leg[] pain and supported by a cane, c[ould] not

---

[6] Plaintiff's statement that "[t]he regulations applicable to [his] claim require an ALJ to . . . consider[] several factors including the length of the treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, supportability, consistency and specialization" (Docket Entry 15 at 9 (emphasis added)) echoes the rules governing the evaluation of medical opinions prior to the above-detailed revisions applicable to claims (like Plaintiff's) filed on or after March 27, 2017.

squat, and ambulate[d] with complaints of pain in [his] legs
supporting himself with a cane." (Id.) As a result of Plaintiff's
subjective symptom reporting and the examination findings, Dr.
Forero diagnosed Plaintiff with "'[CRPS]'" and "multiple subjective
complaints wit[h] probably a psychiatric component" (id.), and
provided the following opinions:

> [Plaintiff] uses a simple cane for walking, standing,
> balance and pain. This device is needed all the time.
> The device was prescribed by [a d]octor on or around
> [sic]. [Plaintiff] was given the following instructions
> for the device's use by [the d]octor: [c]arry with [the]
> right hand.
>
> [Plaintiff] is unable to walk a block at a reasonable
> pace on a rough/uneven surface. [Plaintiff] is unable to
> climb a few steps at a reasonable pace with the use of a
> single handrail. [Plaintiff] does have full use of the
> other upper extremity for carrying objects.
>
> [Plaintiff]'s ability to handle objects, hear and speak
> is not impaired. [Plaintiff]'s ability to sit is mildly
> impaired. [Plaintiff]'s ability to stand, move about,
> lift, carry, travel and stamina is moderately impaired.

(Id.)

> The ALJ analyzed the opinions of Dr. Forero as follows:

> On August 14, 2018, Dr. Forero stated [Plaintiff] used a
> simple cane for walking, standing, balance, and pain.
> The cane was needed all the time and was prescribed by a
> doctor, and [Plaintiff] was instructed to carry it in his
> right hand. [Plaintiff] was unable to walk a block at a
> reasonable pace on a rough or uneven surface. He was
> unable to climb a few steps at a reasonable pace with the
> use of a single handrail. . . . His ability to stand,
> move about, lift, carry, and travel was moderately
> impaired. His stamina was moderately impaired. The
> [ALJ] finds Dr. Forero's opinion is not persuasive.
> Though it is supported by a his thorough exam, he does
> not provide an explanation and fails to define what he

19

> means by "moderately impaired." His opinion is not
> consistent with the other medical evidence of record,
> which shows [Plaintiff] had improved strength in the left
> lower extremity to 4/5 and otherwise generally normal
> exams.

(Tr. 25 (emphasis added) (internal parenthetical citations omitted).) Plaintiff's arguments establish grounds for remand.

Plaintiff first faults the ALJ for finding Dr. Forero's opinions "inconsistent with . . . examinations that were mostly normal save for reduced strength." (Docket Entry 15 at 8 (citing Tr. 25).) Plaintiff deems that finding "incorrect," and points to "consistent[]" findings of "gait abnormalities" (id. (referring to previous citations to Tr. 264, 293-94, 356-57, 361, 376, 386, 400, 407, 424, 482, 537, 571, 592, 609, 632, 641, 645, 653)), as well as "routine[]" findings of allodynia and pain during his examinations" (id. (citing Tr 260, 294, 371, 376, 641, 653)). Plaintiff additionally posits that the ALJ's finding regarding largely normal examinations "misses the point," because Plaintiff's "primary impairment was CRPS and his primary limiting factor and the cause of his loss of function was pain" and thus "[i]ntermittent normal findings do not negate [his] pain." (Id. (citing Arakas, 983 F.3d at 97-98).)

The ALJ erred by discounting Dr. Forero's opinions as "not consistent with the other medical evidence of record, which show[ed] Plaintiff] had improved strength in the left lower extremity to 4/5 and otherwise generally normal exams." (Tr. 25 (emphasis added).)

20

The ALJ supported her statement regarding "generally normal exams"

(id.) with the following summarization of the evidence:

> The [ALJ] finds the evidence does not support the alleged loss of functioning. He had generally normal examinations, except for some decreased strength in the left lower extremity. In November 2017, he was not taking any medications. He moved all extremities well and had a normal gait unassisted. Strength was full in the bilateral lower extremities. In August 2018, the consultative examiner noted unusual complaints. Although there was muscle tenderness in the lower extremities, there was no atrophy or fasciculations. Muscle strength was 3/5 in the lower extremities; however, his strength has improved significantly - on February 13, 2019, he had 5/5 strength in the upper extremities and right lower extremity and 4/5 strength in the left lower extremity. At a February 3, 2019, exam, he had normal range of motion in all extremities except for pain with full extension of the left elbow. Although there was tenderness over the medial epicondyles, there was no effusion, warmth, or edema. On exam by a pain management specialist on February 13, 2019, there was no clubbing, cyanosis, or edema of the extremities, and a neurological exam was normal. Reflexes were +2 and symmetric in all four extremities, and he had good range of motion of all joints. In March 2019, he was taking tizanidine and reported he was able to perform the majority of his activities of daily living on the current regimen. He was noted to have exaggerated his deficits at the functional capacity evaluation in March 2019.

(Tr. 24 (emphasis added) (internal parenthetical citations omitted).) The ALJ erred in two respects with regard to her discussion of "generally normal examinations." (Id.)

First, the ALJ's above-quoted summarization entirely ignored Plaintiff's repeated complaints of allodynia and cited to objective findings such as "normal" or "good" range of motion and a lack of atrophy and fasciculations, without explaining how those findings

21

related to the intensity, persistence, and limiting effects of
Plaintiff's CRPS pain and other symptoms. (Id.) The National
Institute of Health's National Institute of Neurological Disorders
and Stroke describes CRPS and its typical symptoms as follows:

> [CRPS] is a broad term describing excess and prolonged
> pain and inflammation that follows an injury to an arm or
> leg. . . . People with CRPS have changing combinations
> of spontaneous pain or excess pain that is much greater
> than normal following something as mild as a touch.
> Other symptoms include changes in skin color,
> temperature, and/or swelling on the arm or leg below the
> site of injury. Although CRPS improves over time,
> eventually going away in most people, the rare severe or
> prolonged cases are profoundly disabling.
>
> What are typical symptoms of CRPS?
>
> • **Unprovoked or spontaneous pain that can be constant
>   or fluctuate with activity.** Some say it feels like
>   a "burning" or "pins and needles" sensation, or as
>   if the affected limb was being squeezed. Over
>   time, if nerves remain chronically inflamed, pain
>   can spread to involve most or all of the arm or
>   leg, even if the originally affected area was
>   smaller. In rare cases, pain and other symptoms
>   occur in a matching location on the opposite limb.
>
> • **Excess or prolonged pain after use or contact.**
>   There is often increased sensitivity in the
>   affected area, known as allodynia, in which light
>   touch, normal physical contact, and use is felt by
>   the person to be very painful. Some notice severe
>   or prolonged pain after a mildly painful stimulus
>   such as a pin prick, known as hyperalgesia.
>
> . . .
>
> • **Impaired muscle strength and movement.** Most people
>   with CRPS do not have direct injury to the nerve
>   fibers that control the muscles coordinating muscle
>   movement. However, most report reduced ability to
>   move the affected body part. This is usually due
>   to pain and abnormalities in the sensory input that

> helps coordinate movements. . . . <u>Rare patients</u>
> <u>report abnormal movement in the affected limbs</u>,
> fixed abnormal posture called dystonia, <u>and tremors</u>
> <u>[] or jerking</u>.

https://www.ninds.nih.gov/Disorders/Patient-Caregiver-Education/
Fact-Sheets/Complex-Regional-Pain-Syndrome-Fact-Sheet (emphasis
added) (last visited Jan. 6, 2022). Significantly, Plaintiff's
repeated complaints of allodynia, i.e., extreme pain in an
expanding area of his left lower extremity (eventually spreading to
his right lower extremity) triggered by light touch, wearing long
pants, water hitting his legs in the shower, and gusts of wind, as
well as his reports of numbness and tingling (<u>see</u> Tr. 46-50, 52-53,
199-200, 250, 292, 294, 370, 376, 443, 458, 472, 480, 490, 524,
534, 566, 637, 641, 645, 656, 660), match the above-described
typical characteristics of CRPS. Yet, the ALJ did not discuss
Plaintiff's consistent reports of allodynia in the summary of
evidence the ALJ believed supported her finding that "the evidence
d[id] not support the alleged loss of functioning." (Tr. 24.)

The ALJ additionally relied upon findings of purportedly
"normal" or "good" range of motion (<u>id.</u>) without acknowledging that
Plaintiff rarely had full range of motion in his left lower
extremity and nearly always reported pain from the movement (<u>see</u>
Tr. 260, 291, 358, 360-61, 366, 370, 385, 534, 650). Plaintiff's
pain with range of motion testing coheres with the above-quoted
observation that "[m]ost people with CRPS do not have direct injury

23

to the nerve fibers that control the muscles coordinating muscle
movement[, but] . . . report reduced ability to move the affected
body part[] . . . usually due to pain and abnormalities in the
sensory input that helps coordinate movements." https://www.
ninds.nih.gov/Disorders/Patient-Caregiver-Education/Fact-
Sheets/Complex-Regional-Pain-Syndrome-Fact-Sheet (emphasis added)
(last visited Jan. 6, 2022). Furthermore, in light of the facts
that "[m]ost people with CRPS do not have direct injury to the
nerve fibers that control the muscles" and "[r]are patients report
abnormal movement in the affected limbs, . . . and tremors [] or
jerking," id. (emphasis added), the ALJ's reliance on the absence
of atrophy and fasciculations (see Tr. 24), without further
explanation, fails to bolster her finding that "the evidence does
not support the alleged loss of functioning" (id.). See Monroe v,
Colvin, 826 F.3d 176, 190 (4th Cir. 2016) ("[T]he ALJ does not
indicate how any of the facts he cited show that [the plaintiff]
did not lose consciousness two or three times daily or suffer
extreme fatigue. . . . In citing 'normal' results from pulmonary
and respiratory tests and an EEG, the ALJ did not explain why he
believed these results had any relevance to the question of what
symptoms Monroe suffered from narcolepsy. . . . On remand, if the
ALJ decides to discredit [the plaintiff]'s testimony regarding his
episodes of loss of consciousness and fatigue, it will be incumbent
on [the ALJ] to provide a clearer explanation of his reasons for

24

doing so, such that it will allow meaningful review of his decision.").

Second, the ALJ mischaracterized the record in finding Plaintiff had "generally normal examinations." (Tr. 24.) Although some of Plaintiff's providers noted a "[n]ormal gait unassisted" <u>intermittently</u> from November 18, 2016, to January 8, 2018 (Tr. 438, 447, 454, 460, 468, 475, 527, 534), the ALJ's summarization glossed over a large quantity of the remaining medical evidence which reflected an abnormal gait and/or assistive device usage (see Tr. 260, 264, 294, 356, 360, 369, 371, 376, 386, 407, 424, 431, 482, 493, 571, 592, 632, 641, 650, 656). The ALJ also highlighted the fact Plaintiff "was not taking any medications" (Tr. 24) without also acknowledging that he had tried, without success, a corticosteroid injection (see Tr. 47, 50, 57, 362, 364), multiple nerve blocks (see Tr. 50, 378-91), a spinal cord stimulator (see Tr. 55, 478-90), a Quell electrical stimulation system (see Tr. 463, 465), physical therapy (see Tr. 48, 367), and no fewer than 12 different pain medications to try to control his pain and other CRPS symptoms (see Tr. 57 (OxyContin), 371 (Neurontin), 400 (diclofenac), 409 (Topamax), 410 (lidocaine), 470 (Nucynta), 434 (methadone), 441 (Tramadol), 451 (MSContin), 456 (Opana ER), 463 (Lyrica), 529 (Vimpat)).[7] In short, "[t]he ALJ cited evidence that

_____

[7] Plaintiff additionally sought a trial of bisphosphonate medication but his providers felt that the reproductive side effects outweighed any possible benefit (see Tr. 524, 529), as well as intra-thecal Prialt, which his insurance

[s]he appeared to believe tended to discredit [Plaintiff]'s testimony regarding his claimed [CRPS symptoms[; h]owever, [t]he [ALJ] failed to 'build an accurate and logical bridge from the evidence to h[er] conclusion.'" <u>Monroe</u>, 826 F.3d at 189 (quoting <u>Clifford v. Apfel</u>, 227 F.3d 863, 872 (7th Cir. 2000)).

Plaintiff additionally challenges the ALJ's observation that Dr. Forero failed to "explain and define what he mean[t] by 'moderately impaired'" (Docket Entry 15 at 8 (quoting Tr. 25)), because Dr. Forero also "unambiguously state[d] that [Plaintiff] need[ed] a cane in all situations and . . . [wa]s unable to walk a block at a reasonable pace on rough/uneven surfaces [or] . . . climb a few steps at a reasonable pace with the use of single handrail" (<u>id.</u> at 8-9 (citing Tr. 294)). As discussed above in the context of Plaintiff's first issue on review, the ALJ expressly acknowledged Dr. Forero's opinions regarding the necessity of Plaintiff's cane (<u>see</u> Tr. 25) and thus did not ignore those opinions. Nonetheless, given that the ALJ must reassess other aspects of Dr. Forero's opinions, the ALJ necessarily must reassess Dr. Forero's opinion regarding cane necessity to the extent those opinions together bear on the disability determination.

---

denied (<u>see</u> Tr. 530, 537, 566).

In light of the foregoing analysis, the Court should remand
this matter to the ALJ for further consideration of Dr. Forero's
opinions.

### 3. **Need to Elevate the Left Lower Extremity**

Lastly, Plaintiff argues that "[t]he ALJ failed to account for
Plaintiff's need to elevate his left lower extremity in the RFC."
(Docket Entry 15 at 11 (bold font and single-spacing omitted).)  In
particular, Plaintiff points to his testimony that "he spends as
much as fourteen to eighteen hours of the day either lying in the
bed or sitting in the recliner with his feet elevated" (id. (citing
Tr. 58)), and references four occasions on which either he reported
to his providers that his CRPS symptoms required him to elevate his
legs for most of the day (id. (citing Tr. 645, 652)), or his
providers observed Plaintiff sitting with his left leg elevated
(id. (citing Tr. 251, 264)).  Plaintiff notes that, "[d]espite that
evidence, the ALJ d[id] not evaluate [Plaintiff]'s need to elevate
his legs and d[id] not account for it in the RFC determination."
(Id. (citing Tr. 19-23).)  According to Plaintiff, "[i]f the ALJ
decided that [Plaintiff's] evidence did not warrant a limitation in
the RFC allowing for the elevation of his lower extremities, then
[the ALJ] should have said so and explained why she was discounting
th[at] evidence."  (Id. at 12 (citing Radford v. Colvin, 734 F.3d
288, 295 (4th Cir. 2013); see also id. at 12-13 (additionally
citing Mays v. Saul, No. 3:19CV692, 2020 WL 6694309, at *3

27

(W.D.N.C. Oct. 20, 2020) (unpublished), <u>recommendation adopted</u>, 2020 WL 6689356 (W.D.N.C. Nov. 12, 2020) (unpublished), <u>Hall v. Berryhill</u>, No. 3:17CV285, 2018 WL 1463702, at *3 (W.D.N.C. Mar. 23, 2018) (unpublished), and <u>Hunter-Tedder v. Berryhill</u>, No. 5:17CV53, 2017 WL 5759941, at *3 (W.D.N.C. Nov. 28, 2017) (unpublished)).) Plaintiff deems "[t]h[at] oversight [] a significant error," because "the need to elevate his legs periodically to relieve [] pain would certainly impact his ability to work a full-time job," and "the VE testified that elevating the legs at the waist level or higher when seated would preclude work activity even at the sedentary level of exertion." (<u>Id.</u> (citing Tr. 67).) Plaintiff's arguments establish an additional ground for remand.

The ALJ expressly recognized Plaintiff's testimony that "he spen[t] most of his time in a bed or a recliner with his leg elevated" (Tr. 19), but concluded that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [his] symptoms [we]re not entirely consistent with the medical evidence and other evidence in the record" (Tr. 20). However, as discussed above, the ALJ erred in her analysis of Plaintiff's subjective symptom reports in two respects. First, the ALJ's summarization of the medical evidence glossed over Plaintiff's consistent reports of allodynia in favor of citation to objective findings such as "normal" or "good" range of motion and the absence of atrophy and fasciculations, without explaining how those findings related to

28

the intensity, persistence, and limiting effects of Plaintiff's CRPS pain and other symptoms. (Tr. 24.) The ALJ additionally mischaracterized the record with regard to Plaintiff's gait abnormalities and observed that Plaintiff "was not taking any medications" (id.) without recognizing the multiple medications and other treatments that Plaintiff had tried in an unfruitful effort to gain control of his CRPS pain and other symptoms (see Tr. 47-48, 50, 55, 57, 362, 364, 367, 371, 378-91, 400, 409-10, 434 441 451 456 463, 465, 470, 478-90, 529). Beyond the ALJ's erroneous analysis of Plaintiff's subjective symptom reporting, the ALJ's RFC discussion does not contain any further explanation for why she omitted from the RFC Plaintiff's alleged need to elevate his lower extremities. (See Tr. 19-26.)

Although the Commissioner argues that "Plaintiff was never advised by his [medical providers] to keep his left leg elevated" (Docket Entry 20 at 18 (citing Tr. 251-52, 264, 367, 477, 537, 589, 635, 650)), and "was often counseled to maintain normal activity and avoid prolonged bed rest" (id. (citing Tr. 378, 457, 474, 530, 650)), the ALJ did not provide those rationales for omitting a leg elevation requirement from the RFC in her decision (see Tr. 19-26), and the Court cannot consider the Commissioner's post hoc rationalizations for the ALJ's RFC, see Anderson v. Colvin, No. 1:10CV671, 2014 WL 1224726, at *1 (M.D.N.C. Mar. 25, 2014) (unpublished) (Osteen, Jr., C.J.) (holding that the Court's

29

"[r]eview of the ALJ's ruling is limited [ ] by the so-called 'Chenery Doctrine,' which prohibits courts from considering post hoc rationalizations in defense of administrative agency decisions," and noting that "a reviewing court 'must judge the propriety of [agency] action solely by the grounds invoked by the agency[, and i]f those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis'" (quoting <u>Securities & Exch. Comm'n v. Chenery Corp.</u>, 332 U.S. 194, 196 (1947))).

In sum, the Court should additionally order remand on Plaintiff's third assignment of error.

### III. CONCLUSION

Plaintiff has established two grounds for remand.[8]

**IT IS THEREFORE RECOMMENDED** that the Commissioner's decision finding no disability be vacated and that the matter be reversed and remanded under sentence four of 42 U.S.C. § 405(g) for 1) further consideration of the opinions of Dr. Forero, and 2) evaluation of Plaintiff's need to elevate his lower extremities. As a result, Plaintiff's Motion for Judgment on the Pleadings (Docket Entry 14) should be granted in part, i.e., to the extent it

---

[8] Plaintiff's Memorandum alternatively asks for "reversal of the ALJ's decision." (Docket Entry 15 at 13.) In this case, the Court should opt for remand, because Plaintiff's Memorandum does not adequately develop a cogent argument justifying reversal for an award of benefits. (<u>See</u> <u>id.</u> at 4-13.)

requests remand, and Defendant's Motion for Judgment on the Pleadings (Docket Entry 19) should be denied.

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**

January 19, 2022